MICHAEL L. HINCKLEY, State Bar No. 161645
LIDIA STIGLICH, State Bar No. 182100
STIGLICH & HINCKLEY, LLP
803 Hearst Avenue
Berkeley, California 94710
Telephone:    (510) 486-0800
Facsimile:     (510) 486-0801

Attorneys for Defendant
SERGIO IVAN GUTIERREZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | Case No. CR 10-00349-1 JSW |
|---|---|
| Plaintiff, | **DEFENDANT SERGIO GUTIERREZ'S SENTENCING MEMORANDUM & REQUEST FOR VARIANCE** |
| vs. | |
| SERGIO IVAN GUTIERREZ, | Date: November 15, 2012
Time: 2:00 p.m. |
| Defendant. | Courtroom: Hon. Jeffrey S. White |

### I. INTRODUCTION

On August 29, 2012, Sergio Gutierrez was convicted by a jury of Conspiracy to Commit Mail and Wire Fraud (18 U.S.C. § 1349), and several counts of Mail Fraud (18 U.S.C. § 1341).

In many ways this is a sad and poignant case. Mr. Gutierrez is a naturalized citizen born in Nicaragua who, until the events of this case, had lived a largely successful life as a small business operator and family man. A lifelong entrepreneur, Mr. Gutierrez created a small marketing and advertising business that provided the financial ability to raise a family in modest but comfortable circumstances. Mr. Gutierrez and his wife Glenda raised two talented and accomplished daughters, both of whom are presently attending California universities (they were both high school students during the time of the events of this case).

1

Things began to fall apart for Mr. Gutierrez when the economy contracted into a severe recession in the mid-2000s. Like many others, Mr. Gutierrez's world was rocked to the foundation by the crash of the housing market. He saw his business begin to flounder, and he found himself unable to make mortgage payments. He also began to experience severe health problems. The stress became overwhelming and there is little doubt that Mr. Gutierrez's judgment and mental well-being were affected. The stage was set for the tragic circumstances which make up this case.

As set forth herein, the totalities of the circumstances in this case support the defense's position that a low-end guideline sentence of 30 months in custody is appropriate. Indeed, whatever the guideline calculation, 30 months is the appropriate sentence to meet the sentencing goals of imposing a sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. §3553.

## II. FACTUAL BACKGROUND / OFFENSE CONDUCT

The Pre-Sentence Report sets forth an "Offense Conduct" section. Counsel for Mr. Gutierrez provided objections to various contentions and conclusions stated in that section. Many of those objections remain disputed and are identified in the final PSR Addendum for the Courts review. These objections are incorporated by reference but not repeated. The more substantive of these unresolved objections shall be addressed herein.

## III. SENTENCING GUIDELINE CALCULATIONS

As set forth below, the requested application of the advisory sentencing guidelines results in a sentencing range of **30-37** months in custody. The calculations follow:

### A. Base Offense Level

Pursuant to U.S.S.G. § 2B1.1(a)(1), the Base Offense Level for the offenses set forth in the Indictment is a level **7**.

2

### B. *Specific Offense Characteristic*

Probation has suggested a loss amount of $637,000 and urges a 14 level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(H) (loss is more than $400,000, but less than $1,000,000). However, as set forth below, Probation's loss figure, which was supplied by the government, is not supported by the evidence.

#### a. Loss Amount

The Presentence Report calculates the loss amount to be approximately $637,000, the initial amount provided by the government. This figure comes from adding two amounts: 1) $140,000.00, the money which they contend was paid by victims to Mr. Gutierrez; and 2) $497,000.00, the money they contend was lost by lenders as a result of the foreclosure of victims' homes. This $497,000.00 figure is derived by a methodology of including losses incurred on homes of victims who were current on their mortgage payments at the time they entered into Gutierrez's mortgage program and is intended to exclude homes of victims who were already behind on their payments and, as such, were likely to lose their homes regardless. The defense objected to use of this loss figure as unproven, absent an explanation of how the figure was derived.

In its recent filing, the government, using the same methodology, has adjusted its figures as follows: 1) $89,835 paid out by victims; and 2) $799,770.00 loss to lenders. Defense concurs with use of the 89k loss figure but objects to the use of the $799K figure based on "loss" to lenders.

As set forth below the properties/figures used to make up the $799k either fall outside the aforementioned methodology proposed by the government and probation and/or are unsupported by the evidence:

- **Maria Roxana Rivasplata, $149,412**. Ms. Rivasplata did not legally own any property in this case because her "credit was not good." (Exhibit A, 302-0105 [all exhibits shall be filed under separate cover]). Instead of living within their means, she and her husband used two different straw

3

buyers to purchase two homes in the names of the straw buyers, and by using the credit of the straw buyers. The straw buyer for the 175 Seville Street property was Julio Llanos (a relative). The straw buyer for the 16 Newton Street property was Oscar Hernandez (a person they did not know, who was referred to them by their realtor). Both buyers were paid a fee by the Rivasplatas for their services. Hernandez received $1000 and Llano received $3000. (Exhibit B, 302-226, Exhibit A, 302-0105) Per the agreement, Llanos and Hernandez would not live at either residence. Nor would they pay the mortgage. In the words of Mr. Rivasplata, their ownership of the houses was "fictitious". (Exhibit C, 302-229). The loan documents from Oscar Hernandez further reflect that, as part of the scheme to get a loan, he reported that that the property would be his primary residence, that he worked for 3 years as "President" of the Rivasplata's restaurant, that he made over $200,000.00 a year, and that he submitted pay stubs and a W2 to prove it. (Exhibit D, 1C41-0791; 302-0120; 1C41-0900-903). His employment was "confirmed" by the Rivasplata's restaurant when the bank called. (Exhibit E, 1C41-876). All of the assertions about Hernandez's employment and income were false. When asked about Oscar Hernandez by federal agents, the Rivasplatas **did no**t say he was the longtime "President" of their small restaurant, receiving a curiously high salary. Rather, they said that he was a friend of their realtor. Mr. Rivasplata candidly admitted in his interview with the government that he had **never** met Mr. Hernandez -- a fact which is supported by the 302's of all the participants. (Exhibit C, 302-229).

In sum, Ms. Rivasplata is not the legal owner of the at-issue property and the only interest she claims in the property was obtained by false statements made to lenders intended to conceal her lack of creditworthiness, i.e., the fact that she would likely not pay back the loan. Not surprisingly, Ms. Rivasplata reports that after six months of "owning" two homes (which she could not afford), she was have difficulty making the $11,000.00 in monthly payments. (Exhibit A, 302-0106). This was, of course, inevitable. It was then that she began to look for any alternative and became interested in Mr.

Gutierrez's mortgage program. Mr. Gutierrez is not responsible for her failure to making good on her illegal agreement to honor a straw buyer's loan obligation obtained by fraud.

- **Hector Ramos-Villa, $77,016.** Mr. Ramos-Villa falls outside of the stated methodology used for calculating loss. He was "about two months behind" on his mortgage when he learned of the program. (Exhibit F, 302-0078). When asked at trial why he wasn't paying his mortgage he stated it was because he lost his job.

- **Ivonne Curiel, $117,834.** Ms. Curiel did not testify at trial. As a result, there is no support or explanation for the 117K figure provided by the government. There is no explanation for how the figure was derived, or how the "loss" was calculated, or what Ms. Curiel's ability to otherwise make her payments was. Accordingly, this figure should not be included as it is speculative and unproven as to causation.

- **Mohamad Qutteineh, $198,287**. Mr. Qutteineh's home was not lost as result of his participation in the program. Mr. Qutteineh gave a certified statement to his lender setting forth the reason for his mortgage trouble. He explained that he was doing fine until the "loan payments increased beyond [his] income" and that his "home is worth less than what [he] owes". (Exhibit G, 1C32-0420-21). Notably absent from his statement of reasons for being in pre-foreclosure is his involvement in a mortgage program. Accordingly, this figure should not properly be included.

- **Eric Penate, $257,221.** Mr. Penate also falls outside of the stated methodology used for calculating loss. He admitted at trial that he had stopped paying his mortgage for two months prior to hearing of the program because the value of his property had fallen so low. He had a good job working for a bank and made approximately $4,000.00 per month. He stated that after getting dismayed and leaving the mortgage program he continued to live on the property without paying the mortgage. Mr. Penate lived at the home without paying a mortgage for approximately one year before the foreclosure. Asked why he didn't start paying his mortgage after he left the mortgage program, Mr. Penate indicated

5

that paying the mortgage didn't make sense financially due to the drop in property value. Accordingly, this figure should not be included because Mr. Penate was; 1) voluntarily behind on the mortgage before he entered the program; and 2) continued to not pay, despite the ability to do so, after he left the program.

Accordingly, the appropriate loss figure is $89,835 which represents the fees paid out buy the victims for the participation in the program. The $89K figure is more than $70,000 but less than $120,000. As such, pursuant to U.S.S.G. § 2B1.1(b)(1)(E), the base offense level is increased by **8**. **Adjustment -- (+8)**

**Partial Adjusted Offense Level -- 15.**

### C. Number of Victims

Pursuant to USSG § 2B1.1(b)(2)(A)(i), an offense that involves more than 10 victims results in a 2-level increase. **Adjustment -- (+2)**

### D. Victim Vulnerability

The Probation Department contends that victims in this case were vulnerable or particularly susceptible to Mr. Gutierrez's conduct because they "had minimal or no comprehension of the English language." (See PSR at ¶ 27). However, in fact, over one-third of the victims who testified at the trial spoke and understood English (i.e., 5 of 14). Moreover, most of the testifying victims made the decision to participate in the mortgage program *prior* to having *any* contact with Mr. Gutierrez (i.e., 11 of 14). As such, these victims did not participate in the mortgage program because they were susceptible to Mr. Gutierrez's conduct.

Indeed, contrary to being susceptible to Mr. Gutierrez charms, many of the victims that actually met and dealt with Mr. Gutierrez stated that they were put-off by him. Valentin Calderon told federal

agents that had he met Mr. Gutierrez prior to participating in the program he would not have paid to join. He further concluded that Mr. Gutierrez was untrustworthy and non-credible.

Lastly, the contention in the PSR that "most of the victims worked in the day labor trade" is not supported by the evidence at trial. (PSR Addendum, para 6.) As would be expected, few "migrant workers" or those in the "day labor trade" are home owners in the San Francisco Bay Area. Consistent with this reality, with the exception of a few (maybe 2 or 3), the victims who testified held more stable jobs such as office assistant, bank employee, taxi driver, painter, and full-time construction worker. Accordingly, the characterization of the program participants as being "mostly" day laborers is incorrect.

The defense requests that no increase based upon the victim vulnerability be imposed.

**Adjustment -- (0)**

### E. Role in the Offense

Probation suggests a 4 level increase based upon role in the offense based on the contention that Mr. Gutierrez had a leadership role over more than five employees and was thus a leader/organizer of a criminal activity involving five or more participants. (See U.S.S.G. 3B1.1). However, Probation includes as employees individuals who were, not, in fact, employees. Jerry Cain and Monther Al Saleh were not employees of Mr. Gutierrez, nor were they supervised by him. They operated their own businesses, and only used CASH's document prep and related services. There is no credible evidence that Mr. Gutierrez "led or organized" them in anyway.

Likewise, there is no evidence or testimony supporting the conclusion that Marainella Rosales-Orellana was an employee or that she or other office workers were knowingly engaged in criminal activity.

Accordingly, there should not be a 4 level Leader/Organizer enhancement. Rather, a 2 level increase should apply. **Adjustment – (+2)**

### F. Obstruction of Justice

Probation contends that Mr. Gutierrez obstructed justice by committing perjury during the trial when he testified regarding his financial relationship with co-defendant Monther Al Saleh. Mr. Gutierrez testified over a period of two days – August 27, 2012 and August 28, 2012. Probation asserts that during testimony on direct examination Mr. Gutierrez stated that he had no financial arrangement with Al Saleh, while on cross examination Mr. Gutierrez admitted that he had received a $750 check from Al Saleh, and had other financial dealings with him.

Probation misconstrues Mr. Gutierrez's testimony. Mr. Gutierrez did not testify that he had no financial relationship with Al Saleh. Mr. Gutierrez's direct examination began on August 27th. Near the end of that court date he was asked whether Al Saleh had worked for him. Mr. Gutierrez responded that Al Saleh did not work for him. Mr. Gutierrez was then asked if he had a financial relationship with Al Saleh. Mr. Gutierrez responded "not at the beginning, no." (See 8/27/12 TT 28:5-14). Mr. Gutierrez was not asked to explain or expound on what he meant by the qualifier "not at the beginning." Soon after, the August 27th court session ended. The following morning, on August 28th, on direct examination counsel returned immediately to the subject of a financial relationship with Al Saleh. Mr. Gutierrez was asked whether he and Al Saleh had a financial arrangement with respect to clients. Mr. Gutierrez readily admitted that such a financial arrangement existed and explained the arrangement in detail. (See 8/28/12 TT 2:19-3:22). During cross examination the prosecutor suggested that during testimony the prior date Mr. Gutierrez testified that he had "no financial arrangement" with Al Saleh. Mr. Gutierrez, agreed with the prosecutor's mischaracterization of his prior testimony -- but in fact that had not been his prior testimony. (See 8/28/12 TT 44:2-5). As noted above, Mr. Gutierrez's prior testimony was not that he had no financial relationship with Al Saleh, but that "in the beginning" he had

8

no financial relationship with Al Saleh. Mr. Gutierrez did not perjure himself when testifying on this issue and he did not obstruct justice. **Adjustment – (0).**

**Total Adjusted Offense Level -- 19.**

### G. Criminal History Category

Mr. Gutierrez has no countable criminal convictions. Accordingly, he receives no criminal history points, and is placed in Criminal History Category I.

The applicable sentencing guideline range based on these factors is therefore calculated using an offense level of 19 applied to Criminal History Category I; resulting in a sentencing range of 30-37 months.

### H. Booker Factors

In determining the appropriate sentence the courts are directed to fashion sentences that are "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. §3553(a)(2):

    (a)    retribution (to reflect seriousness of the offense, to promote respect for the law, and provided "just punishment");

    (b)    deterrence;

    (c)    incapacitation ("to protect the public from further crimes"); and

    (d)    rehabilitation ("to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner").

(See *United States v. Carty*, 520 F.3d 984, 991 (9th Cir 2008)).

In determining the sentence minimally sufficient to comply with the aforementioned purposes of sentencing the court must consider several factors listed in Section 3553(a). These factors are:

    (1)    "the nature and circumstances of the offense and history and characteristics of the defendant;"

    (2)    "the kinds of sentences available;"

9

(3) the guidelines and policy statements issued by the Sentencing Commission, including the (now advisory) guideline range;

(4) the need to avoid unwarranted sentencing disparity; and

(5) the need to provide restitution where applicable.

(18 U.S.C. §3553(a)(1), a(3),(a)(5)-(7).)

Application of the § 3553(a) factors and adherence to the § 3553(a)(2) purposes of sentencing to the unique facts and circumstances of this case, as set forth in detail below, support the 30 month sentence requested herein.

**1. Statement re Relevant 3553 Facts**

    **a. Background**

48 year-old Sergio Gutierrez was born on December 7, 1963 in Leon, Nicaragua. His father, Roland Gutierrez, is now deceased. His elderly mother, Gloria Gutierrez, lives in San Francisco. Mr. Gutierrez has four siblings. His sister, Gloria Mestayer, lives in San Francisco and cares for their mother.

Mr. Gutierrez came to the United States with his family in 1978. His family immediately settled in San Francisco, and Mr. Gutierrez has remained here for most of his life.

    **b. Education**

Mr. Gutierrez attended and graduated from Wilson High School in 1980. Mr. Gutierrez took college level courses at Cogsell College in San Francisco following his graduation from high school. However, he did not obtain any degrees.

    **c. Employment**

Mr. Gutierrez is an entrepreneur who in 1987 established a marketing and advertising company known as Examiner One. Mr. Gutierrez became interested in marketing and advertising when he helped his father advertise for a liquor store that he owned and operated. Mr. Gutierrez's advertising company mostly served the Latin community in San Francisco. For

several years the business was a success and provided Mr. Gutierrez the means to raise his family. However, the business was harshly impacted by the sharp financial downturn that hit with the recession of 2007-08. The company stopped operating in 2009.

### d. Family

Mr. Gutierrez has been married to his wife Glenda Gutierrez since 1986. He and Glenda are the parents of two daughters, both of whom are college students. Alyeska Gutierrez is presently a student at the University of California, Riverside. Hazel Gutierrez attends California State University, East Bay.

### e. Mental and Emotional Health

From the beginning of this case there have been concerns that Mr. Gutierrez suffered from and continues to suffer from mental health issues that impacted and impaired his judgment in this case. At the time of his arrest Mr. Gutierrez refused to be fingerprinted by FBI agents unless he was paid because his name was trademarked and copyrighted, and worth substantial amounts of money and gold bullion. The arresting FBI agent noted that Mr. Gutierrez engaged in behavior and made statements that were strange and hard to explain. The previous United States Attorney assigned to the case reported that Mr. Gutierrez had written him several nonsensical letters stating that as a sovereign citizen the government had no power over him.

Mr. Gutierrez's prior counsel reported that Mr. Gutierrez had declined to cooperate or assist him in preparation of his defense and expressed concerns about his mental health. In April 2011, after hearing from prior counsel, the Court ordered that Mr. Gutierrez undergo a psychiatric examination to evaluate his competence. That examiner concluded that he had mental health issues and was not competent to stand trial.

On September 2011, Mr. Gutierrez underwent a further psychiatric examination, and Dr. Roland Levy concluded that Mr. Gutierrez understood the proceedings and had the ability to cooperate with counsel, and therefore was competent to stand trial.

In November 2011, Mr. Gutierrez was referred to mental health counseling at Sharper Future in San Francisco. Sharper Future recommended against counseling because of Mr. Gutierrez's resistance to therapy and "general paranoia" regarding how information obtained in therapy will be used against him. PSR ¶ 47. The probation officer reported noticing similar behavior during the presentence interview stating "[h]is interactions with the undersigned officer was that of a paranoia and general distrust of the justice system." (See PSR Sentencing Recommendation, p.2.)

### IV. CONCLUSION

The totality of the aforementioned circumstances paint a clear picture of a law abiding business man, father, and husband who finds himself before the Court after his life crashed along with the housing market. He lost his financial health through the failure of his business, his physical health through dangerously high blood pressure resulting in hospitalization, his mental health as described above, and now he has lost his liberty.

For the forgoing reasons, the defense requests the Court impose a sentence of 30 months in this matter as the sentence which is "sufficient but not greater than necessary" to meet the statutory goals.

Dated: November 8, 2012            Respectfully submitted,

STIGLICH & HINCKLEY LLP


 /S/ Michael L. Hinckley
By:_____
MICHAEL L. HINCKLEY
Attorneys for Defendant
SERGIO GUTIERREZ